IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OREGON NATURAL DESERT ASSOCIATION,
CENTER FOR BIOLOGICAL DIVERSITY, and
WESTERN WATERSHEDS PROJECT,
                Plaintiffs,
   v.
                           OPINION AND ORDER
                           Civil No. 07-1871-SU

ABIGAIL KIMBELL, Chief, U.S. Forest Service,
GARY L. BENES, Supervisor, Malheur National
Forest, UNITED STATES FOREST SERVICE,
D. ROBERT LOHN, Regional Administrator,
National Marine Fisheries Service, and
NATIONAL MARINE FISHERIES SERVICE,
                Defendants,

   v.

HARLEY ALLEN, SHERRIE ALLEN,
KENNETH R. BROOKS, ROBERT L. BROOKS,
MARY ELLEN BROOKS, RON BURNETTE,
J&M COOMBS RANCH, LLC, MONTY CRUM,
DAYVILLE GRAZING ASSOCIATION,
ELLIOTT LIVESTOCK COMPANY, INC.,
HOLLIDAY LAND & LIVESTOCK, INC.,
DARREL HOLLIDAY RANCH, INC., PETER G.
McELLIGOTT, NANCY J. McELLIGOTT,
LELAND F. McGIRR, JR., MORGRASS GRAZING
ASSOCIATION, ROCKY BLUFF RANCH,
LOREN STOUT, PIPER STOUT, TRINI-D, LLC,
VAUGHAN RANCH, INC., WINDY POINT
CATTLE CO. INC., 4J RANCHES, LLC, dba
4J RANCHES, and CHET HETTINGA,
                        Intervenors.

1 - OPINION AND ORDER

HAGGERTY, Chief Judge:

On December 17, 2007, plaintiffs Oregon Natural Desert Association, Center for Biological Diversity, and Western Watersheds Project (collectively referred to as ONDA) filed a Complaint challenging certain decisions by the United States Forest Service (Forest Service) and the National Marine Fisheries Service (NMFS) that authorized livestock grazing on the Malheur National Forest (MNF) within the John Day River basin. Plaintiffs allege violations of the Endangered Species Act (ESA), National Forest Management Act (NFMA) and Administrative Procedure Act (APA).

On March 31, 2008, ONDA filed a Motion for Temporary Restraining Order and/or Preliminary Injunction [34] and sought an order prohibiting the Forest Service from allowing livestock grazing on the public lands of the Murderers Creek Allotment and Lower Middle Fork Allotment within the MNF until plaintiffs' claims could be heard on the merits. The court consolidated this case with *Allen v. Nat'l Marine Fisheries Service*, No. 08-151-SU (D. Or. filed Feb. 8, 2008) on April 10, 2008. The plaintiffs in *Allen*, who hold term permits or grazing agreements authorizing them to graze livestock on the MNF, are the intervenors in this case.

The parties have submitted extensive briefing, declarations, and exhibits, and the court heard oral argument by counsel and testimony by witnesses Ron Burnette and Loren Stout. This Opinion and Order issues now as formal support for the court's oral decision on May 16, 2008, to grant ONDA's Motion for Temporary Restraining Order and/or Preliminary Injunction.

## BACKGROUND

The Malheur National Forest is in the Blue Mountains of eastern Oregon. It encompasses the upper John Day River and upper Malheur River watersheds. The habitat of

Middle Columbia River (MCR) lies within the boundaries of the Forest. The habitat includes steelhead trout and bull trout – both listed as threatened under the ESA – and inland native redband trout and cutthroat trout. The native trout rely upon the John Day and Malheur river systems and their tributaries for spawning, rearing and migration. The three species require clear and cool streams for spawning, and rely on streambeds low in fine sediment, high in large woody debris, with stable, overhanging banks and large pools.

It is largely undisputed that grazing "directly impacts steelhead and bull trout when livestock enter streams to loaf, drink, or cross the stream. Livestock can trample redds (spawning nests), destroy or dislodge young fish that concentrate in large numbers in small areas, and harass the fish." Second Amended Comp. at 47. Grazing also indirectly degrades fish habitat by removing riparian vegetation, destabilizing stream banks, widening stream channels, promoting incised channels, lowering water tables, reducing pool frequency, increasing soil erosion, and altering water quality. *Id*. at 48. These effects can reduce cover, increase summer water temperatures, promote formation of anchor ice in winter, and increase sedimentation into spawning and rearing habitats. *Id*.

Defendant Forest Service manages livestock grazing on national forests by using three separate decision-making processes: federally issued grazing permits,[1] allotment management

---

[1] The MNF grazing allotments are governed by a permit system under the FLPMA. A grazing permit is a "document authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production." 36 C.F.R. § 222.1(b)(5). Permits are generally issued for periods of ten years. *Id*. § 222.3(c)(1). Permits are issued according to a priority system tied to ownership of private "base property" and set limits on allowable numbers of livestock and seasons of use, based on an allotment's estimated ability to sustain certain average levels of use. *See, e.g., id*. § 222.3(c)(I), (ii); 43 U.S.C. § 1752 (explaining scope and requirements of grazing permit terms and conditions).

plans (AMPs),[2] and annual operating plans (AOPs), now referred to as annual operating instructions (AOIs). [3]

Steelhead, bull trout, redband trout and cutthroat trout are management indicator species (MIS) under the Malheur Forest's Land and Resource Management Plan (Forest Plan or LRMP). The Malheur LRMP requires monitoring of resident fish habitat capability in all subwatersheds on the Forest, using identified management indicator species. The LRMP also requires monitoring of habitat capability in all subwatersheds with existing or potential anadromous fish distribution.

In 1994 and 1995, the Forest Service and the Bureau of Land Management (BLM) developed the "Interim Strategies for Managing Pacific Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho, and portions of California," a regional aquatic conservation strategy known as PACFISH. This strategy was developed to provide interim direction to maintain management options for anadromous fish habitat and to bolster the protections for anadromous fish species. PACFISH amended the Malheur National Forest LRMP for watersheds with anadromous fish. This court described the scope and purpose of PACFISH in a seminal decision:

---

[2]An AMP is an allotment-specific planning document that (1) prescribes the manner and extent to which grazing operations will be conducted in order to meet multiple-use and other goals and objectives; (2) describes any range improvements in place or to be installed and maintained to meet allotment objectives; and (3) contains any other grazing management provisions and objectives prescribed by the Forest Service. 36 C.F.R. § 222.1(b)(2). The Forest Service's regulations require that an AMP be completed for all grazing allotments. The AMP prescribes the extent of grazing on an allotment, and must be consistent with the Forest's Land and Resource Management Plan (the "Forest Plan").

[3]An AOI is a signed agreement issued annually by the Forest Service to a permittee that sets final authorized dates of grazing (the "season of use"), pasture and grazing system rotations, numbers of livestock permitted for the upcoming season, monitoring and reporting requirements, and maximum limits of forage use by livestock. Each allotment is further divided into pastures or units, which allows the Forest Service to control grazing on each allotment at different times and the levels of use throughout the grazing season. The AOIs must also be consistent with the Forest Plan.

4 - OPINION AND ORDER

> After plaintiffs filed this lawsuit, defendant Forest Service approved two decisions that amended the regional guides . . . and the forest plans for the National Forests at issue. These decisions are known as PACFISH, approved on February 25, 1995, and INFISH (Inland Native Fish Strategy), approved on July 28, 1995. PACFISH amended four regional guides and fifteen forest plans, while INFISH amended three regional guides and 22 forest plans. Both plans were designed as interim strategies expected to last 18 months. PACFISH was formally extended when its 18-month term expired, and INFISH, which had no firm expiration date, was extended administratively.
>
> *   *   *
>
> PACFISH establishes goals for watershed, riparian and stream channel conditions to protect and restore habitat. Riparian management objectives (RMOs), delineation of Riparian Habitat Conservation Areas (RHCAs), and establishment of standards and guidelines to govern management actions that will impact fish habitat are the means of achieving these goals. The RMOs establish measurable habitat parameters that define good fish habitat and provide criteria against which progress toward attainment of the riparian goals is measured.
>
> *   *   *
>
> The Interim Strategies for Managing Anadromous Fish-Producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California, commonly known as PACFISH, include "a range of interim management strategies designed to arrest the degradation and begin the restoration of habitat for Pacific salmon, steelhead, and sea-run cutthroat trout (anadromous fish)."

*Friends of Wild Swan v. U.S. Forest Serv.*, 966 F. Supp. 1002, 1010-19 (D. Or. 1997).

The applicable RMOs include pool frequency, water temperature, large woody debris, bank stability, lower bank angle and width to depth ratio. The grazing standard "GM-1" in PACFISH requires that the Forest Service modify grazing practices that retard or prevent RMOs from being attained or are likely to adversely affect listed anadromous fish. Grazing should be suspended if adjusting practices is ineffective in meeting the RMOs or avoiding the adverse effects on the listed fish. This "GM-1" grazing standard provides that the Forest Service must:

> [m]odify grazing practices (e.g., accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent the attainment of Riparian Management Objectives or are likely to adversely affect inland native fish. Suspend grazing if adjusting practices is not effective in meeting Riparian Management Objectives. Suspend grazing if adjusting practices

5 - OPINION AND ORDER

is not effective in meeting Riparian Management Objectives or avoiding adverse effects on listed anadromous fish.

Section 7(a)(2) of the ESA requires a federal agency proposing an action to consult with the federal fish or wildlife management agency with jurisdiction over a listed species to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). The National Marine Fisheries Service has jurisdiction over anadromous fish, including steelhead. Under ESA § 7, the Forest Service prepares a Biological Assessment to evaluate potential effects of proposed grazing on steelhead if the species may be present within the action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(a). If the Biological Assessment identifies that steelhead are "likely to be adversely affected" by the proposed action, the Forest Service conducts formal consultation with NMFS. 50 C.F.R. § 402.14(a). NMFS then produces a BiOp, in which NMFS determines whether the proposed grazing, together with its cumulative effects, is likely to jeopardize the continued existence of a listed species or adversely modify the species's critical habitat. 16 U.S.C. §1536(b); 50 C.F.R. § 402.14(g)(4).

Section 9 of the ESA prohibits the unlawful "take" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). The definition of "take" includes not only killing or injuring a listed species, but also "harm." *Id*. § 1532(19). The ESA regulations define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

6 - OPINION AND ORDER

If NMFS concludes that proposed grazing might result in take of steelhead, the BiOp must include an Incidental Take Statement (ITS). 16 U.S.C. § 1536(b)(4). An ITS (1) specifies the amount or extent of the impact on steelhead of any incidental taking; (2) specifies Reasonable and Prudent Measures to minimize such impact; and (3) sets forth the Terms and Conditions that must be complied with to implement the Reasonable and Prudent Measures. 50 C.F.R. § 402.14(i)(1)(i), (ii), (iv). If the amount or extent of incidental taking of steelhead specified in the ITS is exceeded, if new information reveals effects not previously considered, or if the proposed action is modified to have an effect not previously considered, the Forest Service is obligated to reinitiate consultation with NMFS. *Id*. §§ 402.14(i)(4), 402.16(a)-(c). The ESA's incidental take

provision "indicates that any taking . . . that complies with the conditions set forth in the incidental take statement is permitted." *Ramsey v. Kantor*, 96 F.3d 434, 441 (9th Cir. 1996).

Plaintiffs sued NMFS and FWS, alleging that those BiOps violated the ESA in several ways. In his decision, Judge King overturned the 2006 NMFS BiOps and their ITS, as well as the 2006 FWS BiOp's ITS. *See Ore Nat'l Desert Ass'n v. Lohn*, 485 F. Supp. 2d 1190 (D. Or. 2007), *judgment vacated as moot*, 2007 WL 2377011 (D. Or. Jun 11, 2007) (Civ. No. 06-946-KI). The court held that the "no adverse modification" conclusion and "no jeopardy" conclusions reached by NMFS and the ITSs produced by NMFS and FWS were arbitrary, capricious, and in violation of the ESA.

Meanwhile, as the court was considering the validity of NMFS's 2006 BiOps, the Forest Service and NMFS agreed to conduct a *five-year* consultation to cover grazing activities proposed on the Malheur National Forest from 2007 to 2011. Ex. 1 at 2.

7 - OPINION AND ORDER

This was a departure from the long-established practice of NMFS and the Forest Service conducting annual consultations under ESA § 7(d). Prior to 2007, "the Forest Service consulted annually with the National Marine Fisheries Service . . . regarding the effect of the Malheur National Forest's grazing program on steelhead in the John Day River Basin" but after 2007, "the Forest Service and NMFS prepared a consultation under the Endangered Species Act . . . to cover not one, but five years of proposed grazing on the Malheur National Forest." Pls. Mem. Supp. at 8. The 2007 consultation by the Forest Service and NMFS examined five years of proposed grazing on the Malheur National Forest, beginning with the 2007 grazing season and ending with the 2011 season (hereinafter referred to as the 2007-2011 BiOp). The consultation covered proposed grazing on twenty-two allotments on the MNF, including the Murderers Creek Allotment and the Lower Middle Fork Allotment. The National Marine Fisheries Service based its 2007-2011 BiOp on Biological Assessments prepared by the Forest Service for proposed grazing over the same period.

The Forest Service concluded that proposed grazing was "likely to adversely affect" threatened steelhead and steelhead critical habitat on thirteen allotments, but "not likely to adversely affect" the fish on nine other allotments. *See* Ex. 1 at 2.

The National Marine Fisheries Service concluded that the proposed five-year grazing program was not likely to jeopardize the continued existence of MCR steelhead and not likely to destroy or adversely modify their critical habitat. 2007-2011 BiOp at 216. The 2007-2011 BiOp included an ITS that set a limit for take expressed, in part, in terms of habitat effects. 2007-2011 BiOp at 242-243.

In March 2007, following the Ninth Circuit's decision holding that ONDA may properly challenge the Forest Service's AOIs as "final agency action" under the APA, *See Ore. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006), the Forest Service undertook a "dramatic change from its prior grazing management" and issued a memorandum "eliminating its long-standing practice "of issuing AOIs to permittees. Ex. 5. to Pls. Mem. Supp. at 8.

Instead, the Forest Service issued "Grazing Permit Modification decisions" for grazing on the Malheur National Forest. The Grazing Permit Modification decisions were accompanied by grazing authorization letters to the permittees further specifying livestock numbers, unit or pasture rotation schedules, and on- and off-dates for the livestock.

Like AOIs, these Grazing Permit Modification decisions, and the accompanying authorization letters, included specific instructions that the 10-year term permits and long-term AMPs did not address, responding to issues such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing.

Unlike AOIs, however, the Grazing Permit Modification decisions omitted planned pasture rotation schedules, and did not provide for allotment-wide reductions in stocking numbers based on annual conditions. *See, e.g.,* Ex. 8 (AOI for 2004 grazing season on Murderers Creek allotment).

For each allotment, the 2007–2011 BiOp identifies "move triggers" and annual end-point indicators. Plaintiffs concede that in "an ideal world, according to the 2007–2011 BiOp, 'cattle will be moved if any of the move triggers are met.'" Ex. 1 at 239. However, plaintiffs allege that

the 2007 grazing decisions would allow even more grazing on several allotments than in the 2003 season, when this court expressed a "dire need" for better management.

### Murderers Creek Allotment

The MCA encompasses 62,656 acres within the 85,044 acres of the John Day Watershed in the John Day River system. Murderers Creek is the largest of five tributaries within the allotment used by steelhead for spawning and rearing, which also include South Fork Murderers Creek, Dan's Creek, Deer Creek and Corral Creek. Ex. 3 at 1–2. Smaller tributaries also provide steelhead rearing habitat. *Id*. The proposed action for each of the five years evaluated in the 2007–2011 BA was:

\*   grazing by 675 cow/calf pairs to graze the Murderers Creek allotment on schedules between May 16 and October 15, for a total of 3,729 animal unit months (AUMs); and

\*   Three herds graze the twelve units in the Murderers Creek allotment.

Ex. 3 at 3–11.

Seven of these units contain steelhead spawning and/or rearing habitat. *Id*. at 7. Stream segments in most pastures are currently "functioning at risk." Ex. 1 at 101–04. The Forest Service concluded that its proposed grazing program for 2007–2011 on the Murderers Creek allotment is likely to adversely affect steelhead trout. Nevertheless, proposed usage was significantly increased for each of the five years from 2007 to 2011.

### Lower Middle Fork Allotment

The LMF encompasses about 58,161 acres of public land. Ex. 5 at 1; Ex. 10 (allotment maps). The Forest Service proposed permitting 549 cow/calf pairs to graze the allotment between June 1and October 31, for a total of 3,623 AUMs. Ex. 4 at 19. The proposed action for

10 - OPINION AND ORDER

each of the five years evaluated in the 2007–2011 BA was to permit grazing at levels equal to the maximum permitted 3,623 AUMs. *Id*.

The allotment was divided into three "Areas," with each being further divided into three units referred to as pastures. *Id*. at 31.

Steelhead are present in streams on eight of the nine pastures. *Id*. at 4–12. Creeks on the allotment provide nearly forty-six miles of steelhead habitat, and also support threatened bull trout. *Id*. at 1–2.

Since full grazing resumed in 2003 (following the Summit Fire in 1996), grazing on the LMF allotment has increased. The proposed action set usage for each year from 2007 to 2011 at the highest levels since the Summit Fire.

**CLAIMS**

Plaintiffs bring this action seeking declaratory and injunctive relief challenging whether the NMFS and the Forest Service have complied with the ESA, 16 U.S.C. §§ 1531–43, and the NFMA, 16 U.S.C. §§ 1600–1614, in managing public lands supporting threatened steelhead trout in the Malheur National Forest.

**Claims Against NMFS** (Claims 1, 2 and 3)

Plaintiffs assert that the NMFS violated ESA 7(a)(2) by issuing a BiOp, ITS, and a Letter of Concurrence concerning the impacts of domestic livestock grazing within threatened fish habitat, which are arbitrary, capricious and not in accordance with the ESA.

Plaintiffs argue that the decisions are flawed because they do not properly consider whether the livestock grazing will destroy or adversely modify designated steelhead critical

11 - OPINION AND ORDER

habitat and do not properly consider whether the grazing will jeopardize the continued existence of steelhead.

### Claims Against The Forest Service (Claims 4-9)

Plaintiffs' claims against the Forest Service are summarized below:

1. Brought under ESA § 7(a)(2): the Forest Service's approval of its 2007 Grazing Permit Modification decisions and accompanying grazing authorization letters, and its efforts to prepare a BA, and its reliance upon the NMFS steelhead BiOp and Letter of Concurrence, violate the ESA because the Forest Service has failed to insure that the effects of the grazing activities authorized in the Grazing Permit Modification decisions and annual instruction letters on allotments that may affect steelhead will not adversely modify steelhead critical habitat and will not jeopardize the continued existence of steelhead;

2. Brought under ESA § 7(d): the Forest Service failed to re-initiate consultation when the authorized grazing has exceeded the terms and conditions of the BiOp's ITS and the Letter of Concurrence, which were prepared by NMFS to insure that the grazing authorized by the Malheur National Forest for the period 2007–2011 would not jeopardize listed steelhead. Livestock grazing on allotments that may affect steelhead, as authorized in its 2007 Grazing Permit Modification decisions, has caused take to occur, and continues to cause take to occur,

3. The Forest Service has violated NFMA's requirement that authorized grazing must be consistent with the Malheur National Forest's Land and Resource Management Plan—and specifically the Plan's PACFISH aquatic conservation strategy requirements—by its authorization and management of livestock grazing on the Malheur National Forest's Camp Creek and Lower Middle Fork allotments. The Forest Service also has violated NFMA's requirement to monitor populations of management indicator species and their relationships to habitat change, by its authorization and management of livestock grazing on the Malheur National Forest's Camp Creek and Lower Middle Fork allotments.

## INJUNCTIVE RELIEF SOUGHT:

Plaintiffs contend that the Forest Service and NMFS failed to comply with their obligations under Sections 7 and 9 of the ESA in issuing the 2007–2011 BiOp for steelhead and authorizing grazing on the Murderers Creek and Lower Middle Fork allotments. Plaintiffs

12 - OPINION AND ORDER

sought to enjoin the Forest Service from authorizing, allowing, carrying out, or continuing any further livestock grazing on the Murderers Creek and Lower Middle Fork allotments until plaintiffs' claims could be heard on the merits and until the agency complies with ESA §§ 7 and 9 and request an order requiring the Forest Service to immediately remove all livestock currently grazing on the Murderers Creek and Lower Middle Fork allotments pending adjudication.

## **STANDARDS**

The traditional basis for injunctive relief in the Ninth Circuit is irreparable injury, generally involving balancing (1) the plaintiff's likelihood of success on the merits, (2) whether the balance of irreparable harm favors plaintiff, and (3) whether the public interest favors issuance of the injunction. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). However, by enacting the ESA, Congress altered the normal injunction standards to ensure protection of endangered and threatened species, "making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 194 (1978). Accordingly, courts "may not use equity's scales to strike a different balance." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). As a result, "[t]he traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005).

To obtain injunctive relief under the ESA, a plaintiff must show likely success on the merits. *Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994). To establish the likelihood of success on the merits necessary for a preliminary injunction, a plaintiff

13 - OPINION AND ORDER

must demonstrate "'a fair chance of success.'" *Nat'l Wildlife Fed'n*, 422 F.3d at 794 (quoting *Repub. of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*)). In addition to a likelihood of success on the merits, a plaintiff seeking injunctive relief must also show "irreparable injury" to the species. *Nat'l Wildlife Fed'n*, 23 F.3d at 1511.

Both the NMFS's actions in issuing the 2007-2011 BiOp and the Forest Service's alleged failure to comply with the ESA are reviewed under APA § 706, 5 U.S.C. § 706. *Sierra Club*, 816 F.2d at 1384-87; *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 981 (9th Cir. 1985). Under APA § 706, "the appropriate standard of review for administrative decisions involving the ESA is the 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' standard. Under this standard, administrative action is upheld if the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Friends of Endangered Species*, 760 F.2d at 981-82 (citing 5 U.S.C. § 706(2)(A).

## ANALYSIS

Plaintiffs first argue that the NMFS acted arbitrarily or capriciously under ESA § 7 and the APA by failing to insure against jeopardy to steelhead or destruction or adverse modification of steelhead critical habitat in issuing the 2007-2011 BiOp. Plaintiffs also contend that the Forest Service violated ESA § 7 by failing in its independent duty to insure against jeopardy to steelhead by failing properly to implement its grazing strategy, and instead allowing grazing on the Murderers Creek Allotment and Lower Middle Fork Allotment in 2007 that violated standards set in the 2007-2011 BiOp. Third, plaintiffs also contend that the Forest Service violated ESA § 9 by allowing grazing on the Murderers Creek Allotment and Lower Middle

Fork Allotment in 2007 that exceeded the limit of allowable take set by NMFS in the 2007-2011 BiOp's ITS. Fourth, plaintiffs argue that the Forest Service and NMFS violated the ESA implementing regulations by failing to reinitiate consultation.

As noted above, the parties submitted relevant agency decision documents, expert declarations, photographs, agency guidance, and independent monitoring data for the court's consideration, and presented witnesses at the hearing conducted on May 16, 2008. The court announced its decision on that date in order to advise the parties of the ruling on the motion for a preliminary injunction prior to the scheduled livestock turnout on these allotments. This written explanation of that decision is necessarily limited to the development of the record for purposes of this injunction motion.

Based on the parties' submissions, exhibits, and testimony, this court concluded after the parties' oral argument that plaintiffs are likely to succeed on the merits of at least one of its claims. These allegations, which as summarized above include challenges that the MNF's administration of its grazing program on the Murderers Creek Allotment and the Lower Middle Fork Allotment and the National Marine Fisheries Service's 2007-2011 BiOp violate duties under the ESA.

Moreover, plaintiffs have made a sufficient showing that irreparable injury would occur due to grazing on the Murderers Creek Allotment and the Lower Middle Fork Allotment during the 2008 grazing season. Plaintiffs have proposed that this court expound upon these conclusions. After careful consideration, this court concludes the scope of such an adjudication would reach beyond the standards and obligations applicable in this action for an injunction and, therefore, would be improper.

**CONCLUSION**

Plaintiffs have demonstrated that they are likely to succeed on the merits of at least one of their claims, and have made the additional showing of irreparable injury to steelhead. Accordingly, plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction [34] is GRANTED AS FOLLOWS: the Forest Service, Dayville Grazing Association, Chet Hettinga, Loren Stout, Piper Stout, and Ron Burnette are prohibited from authorizing, allowing or carrying out livestock grazing, on the Murderers Creek Allotment and Lower Middle Fork Allotment on the MNF, pending the court's decision on the merits of plaintiffs' claims.

The bond in this public interest litigation is waived. *See People ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (court has discretion to dispense with the security requirement where requiring security would effectively deny access to judicial review for a non-profit environmental group).

IT IS SO ORDERED.

DATED this  5th  day of September, 2008.

                                                /s/ Ancer L. Haggerty
                                                ANCER L. HAGGERTY
                                                United States District Judge