UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

OREGON NATURAL DESERT ASS'N,
WESTERN WATERSHEDS PROJECT, and
CENTER FOR BIOLOGICAL DIVERSITY,

               Plaintiffs,                   Civil No. 07-1871-HA
                                      [Related Case No. 08-151-HA]
      v.                            [Related Case No. 03-381-HA]

                                      OPINION AND ORDER

TOM TIDWELL, *et al.*,

               Defendants,

      v.

HARLEY & SHERRIE ALLEN, *et al.,*

               Defendants-Intervenors,

_____

HAGGERTY, District Judge:

      Plaintiffs in case number 07-1871-HA (intervenor defendants in 08-151-HA) Oregon

Natural Desert Association, Western Watersheds Project, and Center for Biological Diversity

(collectively referred to as "plaintiffs" or "ONDA") seek declaratory and injunctive relief against

defendants Tom Tidwell, Chief, United States Forest Service; Doug Gochnour, Supervisor,

Malheur National Forest (MNF); the United States Forest Service (Forest Service); Barry Thom,

Acting Regional Administrator, National Marine Fisheries Service; and the National Marine

1- OPINION AND ORDER

Fisheries Service (NMFS) (collectively referred to as "federal defendants"). Plaintiffs allege federal defendants have violated the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–43, and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600–1614, in managing grazing on public lands supporting threatened steelhead trout in Oregon's MNF. Plaintiffs in case number 08-151-HA (intervenor defendants in 07-1871-HA), a group of ranchers[1] permitted to graze cattle on allotments contained within the MNF (collectively referred to as "permittees" or "intervenors"), also seek declaratory and injunctive relief against federal defendants for alleged violations of the ESA.

Plaintiffs, intervenors, and federal defendants have each moved for summary judgment. Plaintiffs and intervenors have also moved to supplement the administrative record. *Amici curiae*[2] have filed a memorandum [400] in support of intervenors' Motion for Summary Judgement. For the following reasons, plaintiffs' Motion to Supplement the Administrative Record [404] is GRANTED and plaintiffs' Motion for Summary Judgment [401] is GRANTED IN PART, intervenors' Motion to File Extra Record Evidence [398] is GRANTED and intervenors' Motion for Summary Judgment [379] is GRANTED IN PART, and federal defendants' Motion for Summary Judgment is GRANTED IN PART [429].

---

[1] Harley and Sherrie Allen; Kenneth R. Brooks; Robert L. and Mary Ellen Brooks; J&M Coombs Ranch, LLC; Monty Crum; Elliott Livestock Company, Inc.; Holliday Land & Livestock, Inc.; Darrel Holldiay Ranch, Inc.; Peter G. and Nancy J. McElligott; Leland F. McGirr, Jr.; Morgrass Grazing Association; Rocky Bluff Ranch; Loren and Piper Stout; Trini-D, LLC; Vaughan Ranch, Inc.; Windy Point Cattle Co. Inc.; and 4J Ranches, LLC, dba 4J Ranches.

[2] Washington Cattlemen's Ass'n, Washington Cattle Feeders Ass'n, Washington Farm Bureau, Cattle Producers of Washington, Stevens County Cattlemen Ass'n, Montana Farm Bureau Fed'n, Oregon Farm Bureau, Oregon Cattlemen's Ass'n, Idaho Farm Bureau Fed'n, and Wyoming Farm Bureau Fed'n.

2- OPINION AND ORDER

## MOTIONS TO SUPPLEMENT THE ADMINISTRATIVE RECORD

Plaintiffs and intervenors each move this court to consider extra-record evidence in its consideration of their respective motions for summary judgment.  Plaintiffs urge this court to consider the expert reports and rebuttals of Dr. Robert Beschta and Jonathon Rhodes and the declarations of Christopher Christie and Linda Driskill.  Intervenors request that this court consider the expert reports of Drs. Victor W. Kaczynski and William C. Krueger, several factual declarations, and numerous published scientific articles attached to counsel's declaration (Howard Decl.).

This court has previously ruled that ONDA's substantive claims under §§ 7 and 9 of the ESA may be supported by extra-record evidence and are not limited to the administrative record review restrictions of the Administrative Procedures Act (APA), 5 U.S.C. § 706. Order of Jan. 9, 2009 [147]; *see also Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2007) (holding that the APA's record review provisions do not apply to claims brought pursuant to "the substantive provisions of the ESA"); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094 (E.D. Wash. 2006).  The court now reaffirms that ruling, and has considered extra-record evidence submitted by the parties relevant to ONDA's substantive claims arising under the ESA's citizen suit provision.  16 U.S.C. § 1540(g).

Judicial review of the remainder of the parties' claims in these actions is governed by the record review provisions of the APA.  Under the APA, judicial review of administrative decisions is generally limited to the administrative record before the agency at the time the challenged decisions were made.  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).  The Ninth Circuit has allowed extra-record materials to be considered in four situations:

(1) to determine whether the agency has considered all relevant factors, (2) when it appears the agency has relied on extra-record evidence, (3) when necessary to explain technical terms or complex subject matter, or (4) when there is a showing of bad faith or improper behavior by the agency. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (citations omitted).

The court has considered extra-record[3] evidence submitted by the parties, including federal defendants, where that evidence assists the court in interpreting the complex scientific subject matter of this litigation. The court has also considered documents germane to the question of whether federal defendants considered all relevant factors in making the challenged decisions. Although this court has considered extra-record evidence in evaluating the parties' motions for summary judgment, and grants the parties' motions to consider extra-record evidence, federal defendants are not required to formally supplement the administrative record.

## STANDARDS

The APA sets forth standards for judicial review of decisions made by federal administrative remedies. *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999). Under the APA, a district court may overturn an agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *Blue Mountains Biodiversity Project v.*

---

[3] Federal defendants assert that there is not one administrative record in this case, but several, one each for several individual administrative decisions made by the defendant agencies. The court has, to the extent possible, considered documents only as they are relevant to a particular challenged action. However, many of the actions and decisions at issue in this litigation are closely intertwined and federal defendants were unable to designate which documents belong in each particular administrative record. For ease of reference, the court simply refers to the "administrative record."

*Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).  In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh*, 490 U.S. at 378.

> A decision is arbitrary and capricious if the agency:
>
> [H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm.*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency need only articulate a rational connection between the facts found and the conclusions made.  *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency.  *O'Keeffe's*, 92 F.3d at 942.  The role of the court is to ensure that the agency "made no clear error of judgment," and the court must "defer to an agency's determination in an area involving a high level of technical expertise."  *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (quotations and citations omitted).

## **BACKGROUND**

Plaintiffs are non-profit environmental organizations.  Plaintiffs contend that the NMFS and Forest Service have violated the ESA and NFMA in managing grazing on the MNF in ways that are alleged to harm steelhead listed as threatened under the ESA.  Intervenors are ranchers permitted to graze cattle on the MNF.  Intervenors allege that the NMFS and Forest Service have

violated the ESA by arbitrarily limiting grazing on the MNF. Federal defendants contend that the agency actions taken in relation to grazing on the MNF were not arbitrary and capricious and have not harmed protected steelhead.

### A.      Overview of the Endangered Species Act

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary of the Interior to list any species as endangered or threatened, and to designate "critical habitat" for that species. *Id.* § 1533(a). "Critical habitat" includes those "areas within the geographical area occupied by the species" that are "essential to the conservation of the species." *Id.* § 1532(5)(a). In furtherance of the purposes of the ESA, citizens are authorized to file suit against any person, including the United States, to enforce any provision of the Act. *Id.* § 1540(g).

#### 1.      Section 9

Section 9 of the ESA prohibits, among other things, the "take" of any listed species. 16 U.S.C. § 1538(a)(1). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The ESA's implementing regulations further define "harm" as an "act which actually kills or injures wildlife" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 696-700 (1995) (upholding the regulatory definition of

6- OPINION AND ORDER

"harm").

        2.      Section 7

Section 7 of the ESA imposes affirmative duties on federal administrative agencies, such as the Forest Service, to conserve listed species and to prevent violations of § 9. Section 7(a)(2) of the ESA requires federal agencies, such as the Forest Service, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2). Whenever a federal agency determines that a proposed action "may affect listed species or critical habitat," that agency must prepare a biological assessment on the effects of the action. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(c). If after preparing a biological assessment, the agency determines that the proposed action is not likely to adversely affect any listed species or critical habitat, then the agency need not initiate formal consultation with the NMFS or the Fish and Wildlife Service.[4] If the agency determines that the proposed action is likely to adversely affect a listed species or critical habitat, the agency must consult with the NMFS to determine whether the agency action is likely to jeopardize that species or adversely modify its critical habitat. *Id.*; 16 U.S.C. § 1536(c).

Once formal consultation is initiated, the NMFS must review all relevant information and formule a biological opinion (BiOp) regarding whether the action is likely to result in jeopardy to a listed species. 50 C.F.R. § 402.14(g).

---

[4] The NMFS has jurisdiction over anadromous fish species such as the steelhead at issue in this litigation.

7- OPINION AND ORDER

The NMFS "shall use the best scientific and commercial data available" in determining whether an agency action is likely to result in jeopardy to a listed species.  16 U.S.C. § 1536(a)(2); 50 C.F.R.  § 402.14(a).  If the NMFS determines that an agency action is likely to jeopardize the continued existence of a listed species, the NMFS must suggest reasonable and prudent alternatives to the proposed action, if any exist, that would not result in such jeopardy. *Id*. § 1536(b)(3).

If the NMFS concludes that a proposed action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but determines that the action will nevertheless result in the take of listed species, the NMFS must issue an incidental take statement (ITS).  16 U.S.C. § 1536(b)(4).  An ITS authorizes the limited take of listed species that would otherwise violate § 9's "take" prohibition, establishes the limit of any taking of the species, and specifies measures to minimize take.  *Id*.; 50 C.F.R. § 492.14(i).  If during the course of the subject action, the amount or extent of incidental taking is exceeded, the action agency must reinitiate formal consultation pursuant to § 7(a)(2).  50 C.F.R. § 402.16(a).

Once consultation under § 7(a)(2) has been initiated, or reinitiated, § 7(d) prohibits federal agencies from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative" to the proposed action. 16 U.S.C. § 1536(d).

**B.    Overview of the National Forest Management Act**

The NFMA provides the statutory framework by which the Forest Service is to manage

National Forest System lands. *The Lands Council*, 537 F.3d at 988. The NFMA requires the

Forest Service to manage Forest System Lands in order to "provide for diversity of plant and

animal communities based on the suitability and capability of the specific land area in order to

meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). The NFMA directs the Forest

Service to develop an integrated forest plan, or land resource management plan (LRMP) for each

unit of the National Forest System. *Id*. § 1604(a),(f). In formulating each LRMP, the Forest

Service must "use a systematic interdisciplinary approach to achieve integrated consideration of

physical, biological, economic, and other sciences." *Id.* § 1604(b). After a LRMP is developed,

all subsequent Forest Service actions, including the issuance of grazing permits, must be

consistent with the controlling LRMP, which in turn must be consistent with the NFMA. *Id.* §

1604(i); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002).

### C.    Factual Background

The MNF is located in the Blue Mountains of Eastern Oregon and includes portions of

the Upper John Day, Middle Fork John Day, and North Fork John Day River watersheds. It

contains designated critical habitat for Middle Columbia River (MCR) steelhead, a salmonid

listed as "threatened" under the ESA. The MCR steelhead was listed threatened under the ESA

on March 25, 1999 (Threatened Status for Two ESUs of Steelhead in Washington and Oregon,

64 Fed. Reg. 14517-01 (Mar. 15, 1999)), and is designated as a management indicator species

under the MNF's 1990 LRMP. "[D]espite recent increases in MCR steelhead returns . . . the

MCR steelhead species remains likely to become endangered" and steelhead populations in the

Middle Fork John Day, South Fork John Day, and Upper John Day Rivers are "not viable."

Revised Administrative Record Index for Malheur National Forest (hereinafter "RP") 29376-77.

The MCR steelhead rely upon rivers and streams in the MNF for spawning, rearing, and

migratory habitat.  Steelhead depend upon cold clear streams and streambeds low in fine

sediment, high in large woody debris, and characterized by stable overhanging banks and large

pools.

> When not managed properly:
>
> Livestock grazing can degrade salmonid habitat by removing riparian vegetation,
> destabilizing stream banks, widening stream channels, promoting incised
> channels, lowering water tables, reducing pool frequency, increasing soil erosion,
> and altering water quality.  These effects can reduce cover, increase summer
> water temperatures, promote formation of anchor ice in winter, and increase
> sedimentation into spawning and rearing habitats.

*The Lands Council Lohn*, 485 F. Supp. 2d 1190, 1192 (D. Or. 2007) (vacated as moot, 2009 WL

123525 (9th Cir. Jan. 12, 2009)).  Additionally, cattle crossing, drinking, or loafing in streams

can dislodge and harass fish and can trample redds (spawning nests).

The Forest Service authorizes and manages livestock grazing on allotments within the

MNF through the issuance of grazing permits, allotment management plans (AMPs), grazing

permit modifications (GMPs), and annual grazing authorization letters to permittee ranchers such

as intervenors.  Through the use of permits, AMPs, GMPs, and annual grazing authorizations,

the Forest Service specifies, for a particular grazing season, specific livestock numbers, grazing

dates, unit or pasture rotation schedules, and other conditions for each allotment including

habitat monitoring requirements and endpoint and move indicators.

In 1995, the Forest Service approved the Interim Strategies for Managing Anadromous

Fish Producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of

California, commonly known as "PACFISH."  The adoption of PACFISH, which includes "a

range of interim management strategies designed to arrest the degradation and begin the

10- OPINION AND ORDER

restoration of habitat for [anadromous fish]," modified the MNF's 1990 LRMP.  *Friends of Wild Swan, Inc. v. U.S. Forest Service*, 966 F. Supp. 2d 1002, 1010 (D. Or. 1997).  To promote anadromous fish populations:

> PACFISH establishes goals for watershed, riparian and stream channel conditions to protect and restore habitat.  Riparian management objectives (RMOs), delineation of Riparian Habitat Conservation Areas (RHCAs), and establishment of standards and guidelines to govern management actions that will impact fish habitat are the means of achieving these goals.  The RMOs establish measurable habitat parameters that define good fish habitat and provide criteria against which progress toward attainment of the riparian goals is measured.

*Id.*  The RMOs include pool frequency, water temperature, large woody debris, bank stability, lower bank angle, and width to depth ratio.  PACFISH's grazing standard "GM-1" requires the Forest Service to modify grazing practices that retard the attainment of RMOs.  GM-1 requires the Forest Service to:

> Modify grazing practices (e.g., accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent the attainment of [RMOs] or are likely to adversely affect listed adadromous fish. Suspend grazing if adjusting practices is not effective in meeting [RMOs] and avoiding adverse effects on listed anadromous fish.

RP 2459.  Synonymous with the PACFISH mandate not to "retard" the recovery of degraded riparian habitat, is the requirement that the Forest Service provide for a "near natural rate of recovery" such that the effects from a grazing season do not "'carry over to the next year.'"  RP 2819.

These consolidated cases are not the first to challenge the MNF's grazing program.  *See Or. Natural Desert Ass'n v. Kimbell,* No. 07-1871-SU, 2008 WL 4186913, at *1–*7 (D. Or. Sept. 5, 2008); *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, No. 03-381-HA, 2004 WL 1592606 (D. Or. July 15, 2004); *Lohn*, 485 F. Supp. 2d 1190.  This court has repeatedly found

11- OPINION AND ORDER

the grazing program to be insufficiently protective of listed fish species.  In *Lohn*, this court

invalidated the 2006 NMFS BiOp and ITS for MNF grazing activities.  485 F. Supp. 2d at 1198.

On May 23, 2007, the NMFS issued a five year BiOp for MCR steelhead for the MNF's

proposed grazing activities on thirteen allotments from 2007-2011.  The NMFS concluded that

the proposed grazing activities were not likely to jeopardize the continued existence of MCR

steelhead or result in the adverse modification of designated critical habitat.  RP 29529.  As

required by § 7 of the ESA, the NMFS issued an ITS to minimize incidental take associated with

the MNF's grazing proposals.  The BiOp and ITS specified the number of redds that could be

trampled per year on each allotment and set stream bank alteration standards to measure the

maximum amount of take that may occur within the safe harbor of the ITS.  RP 29530-52.

In 2008 and 2009, on ONDA's motions, this court partially enjoined grazing on the MNF

due to likelihood of irreparable harm to steelhead and their habitat.  On May 9, 2009, the Forest

Service reinitiated formal consultation for six of the thirteen allotments covered by the 2007-11

BiOp and has since reinitiated formal consultation for all thirteen allotments, though a new BiOp

will not be ready until the beginning of the 2011 grazing season.

## DISCUSSION

### A.    Justiciability

Federal defendants contend that a number of ONDA's and permittees' claims are not

justiciable because the parties either lack standing to challenge certain actions, because those

claims are now moot, or because the challenged actions are not final agency actions.  These

arguments are addressed in turn.

### 1.    Standing

12- OPINION AND ORDER

To satisfy the standing requirements of Article III of the United States Constitution, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Federal defendants contend that ONDA lacks standing to challenge to the Forest Service's pre-2009 annual grazing authorizations because ONDA is not subject to a present or particularized injury, and because the court cannot provide ONDA with any remedy *vis-a-vis* wholly past grazing activities. This argument is better framed as a mootness argument. Standing must be assessed "at the outset of the litigation." *Id.* at 180. Here, in light of the fact that the case was filed in December of 2007, in between the 2007 and 2008 grazing seasons, the court finds that ONDA satisfied all three standing prongs at the outset of this litigation with respect to the pre-2009 grazing authorizations. Accordingly, federal defendants' standing argument is rejected and this court turns to their mootness arguments.

2.    Mootness

Federal defendants contend that ONDA's NFMA claims challenging pre-2009 grazing authorizations and asserting that the Forest Service is in violation of its duty to reinitiate consultation are moot. This court disagrees.

A federal court's jurisdiction is limited to cases and controversies. Article III of the Constitution "requires that a live controversy persist throughout all stages of the litigation." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1135, 1128-29 (9th Cir. 2005). Where this condition is not met for a particular claim, that claim is moot and this court lacks jurisdiction to

consider it. *Id.* at 1129. An claim is moot "if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). "The party asserting mootness bears the burden of establishing that there is not effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (citation omitted). The burden of establishing mootness "is heavy; a case is not moot where *any* effective relief may be granted." *Id.* (quotation and citation omitted).

ONDA's sixth and seventh claims for relief allege, in part, that the Forest Service's annual grazing authorizations violate the NFMA because they are inconsistent with the LRMP and PACFISH, and because the Forest Service failed to monitor steelhead populations and habitat quality as required by the LRMP. Federal defendants contend that these claims are moot, to the extent that they challenge pre-2009 annual grazing authorizations because the authorizations have been superseded by the agency's subsequent actions.

Federal defendants argue that "for virtually every one of the allotments named in ONDA's NFMA claims, the Forest Service has made adjustments to the authorized grazing in light of the results of the grazing in past seasons on which plaintiffs' claims exclusively rely." Defs.' Mem. at 31. In so arguing, Federal defendants rely upon *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1096 (9th Cir. 2003) (noting that "when one [BiOp] supersedes another, a challenge to the superseded [BiOp] is moot").

This court is not persuaded that an annual grazing authorization is akin to a BiOp. The grazing that takes place on each allotment during a season can have carryover affects that might last one or more seasons into the future. The fact that new annual grazing authorizations have been issued does not mean that damage from previous seasons cannot be remedied.

14- OPINION AND ORDER

"[C]ompletion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). In *Forest Guardians*, the Ninth Circuit held that challenges to a BiOp become moot after the issuance of a superseding document. However, the court held that a challenge to a three-year grazing scheme was not moot because the district court could order the Forest Service "to develop tactics to mitigate the damage caused by the violation, such as moving or removing livestock from the allotments so the land can repair itself." 329 F.3d at 1094; *see also Nw. Entl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (challenge to regulations governing prior year's salmon fishing season was not mooted by the close of the season because the damage could be mitigated by allowing more salmon to spawn in the future).

Here, if the Forest Service violated the NFMA through the issuance of pre-2009 annual grazing authorizations, any damage could be remedied through injunctive relief restricting future grazing. Because relief can be given for the harm alleged by ONDA, those claims challenging pre-2009 annual grazing authorizations are not moot.

Federal defendants next contend that the reinitiation of formal consultation for all thirteen allotments moots ONDA's ninth claim that the Forest Service failed to reinitiate consultation as required by § 7 of the ESA. ONDA responds that this case is materially indistinguishable from the Ninth Circuit's decision in *Forest Guardians v. Johanns*, 450 F.3d at 462-63 ("*Johanns*"). In *Johanns* the Ninth Circuit held that a claim requesting the Forest Service to reinitiate consultation was not mooted by the agency having subsequently reinitiated consultation. *Id*. The court reasoned that even though the only agency action sought by the plaintiff– reinitiation of

consultation– had already occurred, "a declaratory judgment could help remedy the effects of the agency's statutory violations and [] ensure that similar violations would not occur in the future." *Id.* at 462.

Federal defendants contend that this case is distinguishable from *Johanns* in two critical ways. First, the consultation at issue in *Johanns* was on ten-year permit terms which were still in effect, and second, the Forest Service's practice of failing to comply with monitoring requirements was likely to persist. Here, the agency action subject to consultation is a discrete round of grazing authorizations, and the new round of consultation will address a different set of authorizations for future years. Moreover, the Forest Service has not indicated its unwillingness to comply with the terms of the 2007 BiOp.

While the court is cognizant of the differences presented in this case, federal defendants have failed to carry the heavy burden of establishing that this court can provide no effective relief for the violations alleged. As ONDA correctly points out, declaratory relief remains available, as is future injunctive relief. In particular, the coming grazing season will be managed under the 2007 BiOp and declaratory judgment that the Forest Service violated the ESA by failing to timely reinitiate formal consultation could provide effective relief. This is especially true in light of the fact that federal defendants have yet to demonstrate that *formal* consultation has been properly reinitiated, and because federal defendants' response to violations of the ITS appears to have been influenced by a litigation strategy rather than the reinitiation regulations.

> 3.    Final Agency Action

Federal defendants contend that permittees' first claim challenging the Forest Service's biological assessments is not justiciable because the biological assessments do not constitute

16- OPINION AND ORDER

final agency actions within the meaning of the APA.  Federal defendants are correct.

Under the APA, "two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process . . . [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).  Here, the 2007 BiOp and ITS that followed the issuance of the biological assessments constitute justiciable final agency actions.  *See Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1035-36 (9th Cir. 2007) (stating that the "BiOp and its accompanying [ITS] represent final agency action subject to judicial review").  Because the biological assessments were followed by the 2007 BiOp and ITS, the assessments did not mark the consummation of the agency's decisionmaking and were not actions from which legal consequences flowed.  Accordingly, federal defendants are granted summary judgment on permittees' first claim for relief challenging the biological assessments.

**B.    Permittees' Claims Challenging the BiOp and ITS**

Permittees advance a number of claims challenging the 2007 BiOp and ITS as arbitrary and capricious.  In short, permittees contend that federal defendants failed to utilize the best available science and data in formulating the BiOp and ITS, that the ITS is unsupported by sound science, and that the ITS impermissibly alters grazing activities on the allotments.  At the heart of these claims is an assertion that the bank alteration standard contained in the ITS is an unsound and arbitrary habitat proxy for "take."

1.    Best Available Science

Permittees contend that federal defendants violated § 7(a)(2)'s requirement to utilize "the

best scientific and commercial data available" in formulating the 2007 BiOp and ITS.  16 U.S.C.

§ 1536(a)(2).  Permittees allege that:

> NMFS failed to use the best available data in the following respects: (1) NMFS ignored, or failed to consider, data that bears on the extent of impacts to MCR steelhead and critical habitat; (2) NMFS assumed impacts to MCR steelhead in the absence of actual data to show that such impacts will occur; (3) NMFS ignored data and science that directly bears on the extent to which the proposed grazing activities will affect the productivity, abundance, spatial structure and diversity ("viability") of MCR steelhead; and (4) NMFS imposed standards and restrictions on grazing that were not supported by the best available science and data.

Permittees' Mem. at 16.

Section 7(a)(2)'s "best scientific and commercial data available" requirement is intended "to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett*, 520 U.S. at 1168.  This requirement not only advances "the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id*. at 176-77.  The NMFS cannot "ignore available biological information" when formulating a BiOp or ITS.  *Conner v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  However, the NMFS has some discretion in deciding which scientific data is the "best available" because that determination, in and of itself, is scientific in nature and accordingly deserves deference.  *Miccosukee Tribe of Indians of Fla. v. United* States, 566 F.3d 1257, 1265 (11th Cir. 2009) (citing *Marsh*, 490 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive")).

18- OPINION AND ORDER

Permittees contend that the NMFS ignored important scientific research demonstrating that grazing does not result in harm to salmonids. Permittees place particular importance on what has been called the "Catherine Creek" research. The range department at Oregon State University has researched the effects of livestock grazing on Catherine Creek in northeast Oregon for thirty years. The Catherine Creek research suggests that managed grazing has minimal, if any, impacts on salmonids such as the MCR steelhead. Permittees also allege that the NMFS ignored evidence concerning the steelhead life cycle that demonstrates freshwater and riparian conditions have little effect on the viability of MCR steelhead populations when compared with other limiting factors such as oceanic conditions, fishing, hatchery operations, and hydroelectric systems. Moreover, the NMFS allegedly failed to account for the absence of steelhead habitat in multiple units of several allotments. As a result of these oversights, permittees argue that "[d]espite the fact that it had no rational basis to conclude that the proposed controlled livestock grazing would cause habitat impacts affecting MCR steelhead, NMFS repeatedly and blindly concludes that the proposed grazing will harm MCR steelhead." Permittees' Mem. at 20.

As a primary matter, this court has reviewed the administrative record and the 2007 BiOp, and concludes that the NMFS's determination that livestock grazing can adversely affect MCR steelhead was well-founded on ample scientific evidence. However, the court nevertheless must determine whether the NMFS ignored relevant biological information.

Federal defendants contend that the NMFS did not ignore the Catherine Creek studies but simply decided that they were not the best available science because those studies did not accurately reflect the conditions on the MNF. Federal Defendants' Mem. at 50, n.11 (noting that

19- OPINION AND ORDER

"it is not well defined in the Catherine Creek studies how the results may compare to grazing along streams with differing gradient or slope, streambed material composition, streambank soil composition, vegetation cover and type, channel geometry, flow rate and timing, and with differing grazing management practices").  The record supports federal defendants' argument. Permittees acknowledge that the NMFS "must have reviewed and known about the Catherine Creek research."  Permittees' Mem. at 41.  The fact that the NMFS was aware of the Catherine Creek research indicates that they either ignored that information or chose to utilize other information because they deemed it better.  As permittees note, there are thousands of articles and studies dealing with livestock grazing, riparian conditions, and fish habitat.  While the NMFS cannot ignore relevant biological information, it is another thing altogether to require that they cite every potentially relevant study, especially such studies that do not constitute the best available science in the estimation of the expert agency.  Because the question of what constitutes the best scientific information "requires a high level of technical expertise, [courts] must defer to the informed discretion of the" NMFS, so long as that determination was not arbitrary and capricious.  *Marsh*, 490 U.S. at 377 (citations and quotations omitted).  The NMFS's expert determination that the Catherine Creek research did not constitute the best available science was a factual determination well within its discretion under the APA.

       In connection with their challenge to the science utilized by the NMFS, permittees advance arguments challenging the NMFS's scientific determinations.  Permittees assert, among other things, that the BiOp is internally inconsistent, that the NMFS arbitrarily found that livestock grazing would harm MCR steelhead, and that NMFS failed to adequately analyze the impacts of grazing within the life cycle of the fish.

20- OPINION AND ORDER

Permittees' arguments are founded on a conviction that livestock grazing is harmless, a conviction that is belied by ample scientific evidence in the BiOp.  Permittees contend that livestock grazing is harmless (when managed,) and then attack the management scheme (designed to minimize negative grazing effects) because such management is unnecessary. However, the BiOp, citing a number of publications, establishes that poorly managed grazing can lead to a number of synergistic negative effects on steelhead habitat.  *See, e.g.*, RP 29429-31. Although the BiOp concludes that these effects were expected to be "minor," this is because the Forest Service proposed a *managed* grazing scheme.  The fact that the impacts were not anticipated to be severe, or even easily distinguishable from normal conditions, does not mean the BiOp was internally inconsistent or that it was arbitrary and capricious to issue an ITS. Permittees appear to conflate the "jeopardy" determination with "take" requirements under the ESA.  The ESA requires the issuance of an ITS where harm to even one steelhead is anticipated. 50 C.F.R. §§ 222.102, 402.14(i).

Permittees' argument that the NMFS inadequately accounted for the life cycle of the MCR steelhead is unavailing.  The BiOp rightly focuses on freshwater habitat, as that is where the effects of the proposed grazing would occur, but also addresses the full life cycle of the MCR steelhead and other limitations on the species' viability such as the Federal Columbia River Power System.  RP 29380-83.  The mere fact that conditions other than freshwater habitat also affect steelhead viability does not absolve federal defendants from ensuring that grazing activities do not further erode steelhead populations.  Permittees' contention that "even if some harm were possible, the magnitude of any such harm is insignificant compared to other factors limiting the productivity and abundance of MCR steelhead," ignores the fact, as discussed above,

21- OPINION AND ORDER

that the NMFS must issue an ITS where take of even one fish is anticipated. 50 C.F.R. §§

222.102, 402.14(i). Federal defendants appropriately evaluated the impacts of the proposed

grazing in light of the full life cycle of the MCR steelhead.

        2.     Incidental Take Statement

Permittees also challenge the propriety of the bank alteration standards in the ITS. The

BiOp defines bank alteration as follows:

> Bank alteration occurs when cattle walk on the streambank and their hoof prints
> expose at least 12 millimeters (mm) (about 1/2 inch) of bare soil, their hooves break
> vegetation, and leave hoof print at least 12 mm deep, or they compact soil by
> walking over the same area repeatedly even if their hooves displace or sink into the
> soil less than 12 mm. Linear amount of broken streambank resulting from hoof
> shearing is also considered.

RP 29318. The bank alteration standard was chosen as a habitat proxy for "take" of steelhead

because it is difficult to document the actual "take" of a fish. While bank alteration itself has not

been directly linked with take, bank alteration plays a role in a streambank stability (an

important feature of healthy habitat) and the bank alteration standard is "proportional to all of the

habitat impacts and . . . is a standardized and repeatable measurement methodology." *Id.* at

29532. Bank stability "is the ability of a streambank to resist the erosive forces of water" and is

not easily measured. NMFS Administrative Record (AR) 3697. The BiOp noted that "the

amount of unaltered streambank needed to maintain streambank stability ranges from seventy to

one hundred percent, therefore the maximum allowable bank alteration in any system should be

thirty percent." RP 29318. At twenty percent bank alteration, "some soil is exposed to erosion.

However, vegetative cover is still present over much of the altered area and continues to protect

against surface erosion." *Id.* According to published studies, greater than twenty percent bank

alteration "should not occur along high-value fish habitat," for "streams which support

22- OPINION AND ORDER

threatened or endangered species or have been designated critical habitat, and where onsite conditions do not support quick recovery" research indicates that "additional conservation benefits can be realized when the allowable level of streambank alteration is limited to 10%." *Id*. at 29318, 29433.

Permittees first challenge the NMFS's decision to issue an ITS at all.[5] In *Arizona Cattle*, the Ninth Circuit held that the NMFS "must have a reasonable basis to conclude that a take will occur as a result of the anticipated lawful activity" before issuing an ITS. 273 F.3d at 1243. Therefore, the NMFS must be able to articulate "a rational connection between harm to the species and the land grazing activities at issue." *Id.* 1249. Where there is no evidence that the species exists in the action area, an ITS may not issue. Here, it is clear that the species is present in the action area and is subject to harm from the land grazing activities at issue. Accordingly, the issuance of an ITS for each of the subject allotments was appropriate.

Permittees next contend that the ITS is overbroad because it restricts grazing activities in areas where no steelhead habitat exists. This court has reviewed the ITS and finds that the NMFS appropriately limited the provisions of the ITS to stream sections likely containing steelhead for at least part of the year. There is no basis to conclude that the NMFS failed to articulate a rational connection between the facts found and the decisions made. *The Lands Council*, 537 F.3d at 994.

In general, an ITS "sets forth a 'trigger' that, when reached results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to reinitiate consultation." *Arizona Cattle*, 273 F.3d at 1249. When possible, the trigger is a

---

[5] The NMFS issued one ITS for each of the thirteen allotments at issue in this litigation. However, for ease of reference, the court will refer to "ITS" in the singular.

specified number of the protected species that may be incidentally taken. However, as here, where it is difficult or impossible to measure the number of a species harmed by an action, "the use of ecological conditions as a surrogate for defining the amount or extent of incidental take is reasonable so long as these conditions are linked to the take of the protected species." Id. at 1250 (quotation omitted). When establishing a habitat proxy for take in an ITS, the NMFS need not "demonstrate[] a specific number of takings" but "must establish a link between the activity and the taking of species before setting forth specific conditions." Id.

The ITS designates twenty percent bank alteration as a measure of indirect take for all thirteen allotments covered by the BiOp. *See e.g.*, RP 29540. Additionally, the terms and conditions of the ITS include an obligation to comply with move triggers and end-point indicators. In ten allotments, the move triggers and endpoint indicators are set at ten percent bank alteration. RP 29554. Noncompliance with the terms and conditions of the ITS invalidates the safe harbor provision of the ITS.

Permittees contend that bank alteration is not connected with bank stability, increases in sediment, or other habitat impacts that affect MCR steelhead and that it should not be used as an endpoint indicator or proxy for take.

The NMFS has established that livestock grazing results in the adverse modification of steelhead habitat such that fish are harmed, and that bank alteration provides a useful measurement to gauge the intensity of grazing activities and likely impacts on habitat. The causal connection between grazing and take, combined with a habitat proxy designed to measure grazing intensity, provides a rational basis for utilizing bank alteration in the ITS. The fact that the NMFS is not unable to determine exactly how many steelhead will be harmed at a specified level of bank alteration provides not basis to set aside their expert determination. This court

24- OPINION AND ORDER

must be particularly deferential in situations like this "when the agency is making predictions, within its area of special expertise, at the frontiers of science." *McNair*, 537 F.3d 993.

Permittees argue that bank alteration standards in general, and the ten percent standard in particular, are inappropriate due to the high margin of observer error in measuring bank alteration. The administrative record suggests that the margin for error is a significant problem and can range from four to eleven percent. However, the degree of error can be reduced through training and the margin of error is lower at alteration levels below twenty percent. RP 29588. That the bank alteration standard is subject to inaccurate measurement is problematic. However, because it strikes a balance in favor of the species, as it must, and fulfills what has been "termed the 'institutionalized caution mandate' of the ESA," the court does not find it to be arbitrary and capricious. *Washington Toxics*, 413 F.3d at 1031. In light of evidence connecting a ten percent bank alteration standard with conservation benefits, this court cannot conclude that the decision to utilize bank alteration, notwithstanding its possible inaccuracy, was a clear error of judgment. *The Lands Council*, 537 F.3d 994.[6]

Permittees also contend that the ITS impermissibly alters grazing activities on the allotments in violation of ESA regulations. The NMFS may impose "[r]easonable and prudent measures along with the terms and conditions that implement them," but the measures "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2). The proposed action at issue utilized a twenty percent bank alteration standard across all allotments, subject to modification in response to

---

[6] Subsequent to the issuance of the 2007 BiOp, new evidence has surfaced regarding the utility of bank alteration as a proxy for take. *See* Ex. 4 to Federal Defs.' Mem. This court offers no opinion regarding whether or how bank alteration should be utilized in the forthcoming ITS.

allotment conditions, and the ITS modified the proposed action by imposing a ten percent bank alteration move trigger and endpoint indicator on portions of ten allotments. Permittees contend that the application of the ten percent bank alteration standard is violative of § 402.14(i)(2)'s "minor changes" rule.

The evidence relied upon by permittees post-dates the decision and cannot provide the basis for a determination by this court that the NMFS violated the "minor changes" rule. Moreover, the evidence cited by permittees (*see e.g.*, RP 29589-90) does not establish that the ten percent bank alteration standard was not a reasonable and prudent alterative. The administrative record indicates that the ten percent standard is merely an additional layer of protection for steelhead, modifying the already malleable twenty percent standard. The change did not impermissibly alter the proposed action.

### 3.    Applicant Status

Permittees contend that they should have been granted "applicant status" during the MNF's consultation with the NMFS. This court agrees.

An applicant is defined as any person "who requires formal approval or authorization from a Federal agency as a prerequisite to conducting" a proposed action. The ESA's Consultation Handbook further defines who may participate as an applicant during the consultation process:

> Users of public resources (*e.g.* timber companies harvesting on National Forests) are not parties to programmatic section 7 consultations dealing with an agency's overall management operations, including land management planning and other program level consultations. However, users who are party to a discrete action (*i.e.* where they are already the successful bidder on a timber sale contract that becomes the subject of later consultation or reinitiation when a new species is listed or new critical habitat is designated) may participate as applicants in the section 7 process.

26- OPINION AND ORDER

NMFS AR 8351.

According to this definition, as holders of grazing permits that later became subject to reinitiated consultation, permittees would qualify as applicants. However, the ESA does not clearly state when and how applicants may participate in formal consultation.

Section 7(a)(3) of the ESA provides for applicant involvement during the early consultation process. The statute states that federal agencies shall "consult with the [NMFS] on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that a[ listed species] may be present in the area affected by [the applicant's] project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3). Section 7(a)(2), on the other hand, does not expressly provide for such applicant involvement during formal consultation. However, the implementing regulations envision some involvement, because the responsibility to provide the best scientific data available includes a requirement to "provide any applicant with the opportunity to submit information for consideration during the consultation." 50 C.F.R. § 402.14(d). The ESA Consultation Handbook and Forest Service policies further specify that permit holders are entitled to participate as applicants during the consultation process. *See* NMFS AR 8351-52 (stating that "users who are party to a discrete action" qualify as applicants and discussing the applicant's role in the consultation process). Because Federal Defendants failed to, at a minimum, provide permittees with "the opportunity to submit information for consideration during the consultation," the BiOp must be construed as arbitrary and capricious. 50 C.F.R. § 402.14(d).

**C.    ONDA's Claims**

27- OPINION AND ORDER

ONDA asserts a number of claims contending that the BiOp violates the ESA, and that the grazing authorized in 2007, 2008, and 2009 was violative of the ESA and NFMA.

    1.    Conservation Measures

ONDA argues that the "no jeopardy" and "no adverse modification" conclusions in the BiOp were arbitary and capricious because the conservation measures[7] upon which the NMFS relied in issuing the BiOp were not reasonably certain to occur.  In short, due to the repeated failures of the Forest Service and permittees to comply with past conservation measures, such as endpoint and move indicators, ONDA argues that the conservation measures and the grazing management program detailed in the BiOp were not reasonably certain to occur.

When the NMFS relies on conservation measures in issuing a no jeopardy BiOp, those measures must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Ctr. for Biol. Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1379-80 (9th Cir. 1987)); (*see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008) ("even a sincere general commitment to" implement conservation measures is insufficient "absent specific and binding plans")).

Under the BiOp, the MNF implements the grazing strategy, which includes allotment specific standards such as stubble height, shrub use, and bank alteration, and requires the use of

---

    [7] ONDA refers to "mitigation" rather than "conservation" measures in much of their briefing.  Federal defendants correctly point out that the measures described in the BiOp are better characterized as "conservation measures."  This court refers to "conservation" measures, but contrary to federal defendants' contention, finds nothing in the case law to suggest that the cases dealing with mitigation measures are inapplicable to the conservation measures at issue here.  Conservation measures, like mitigation measures, must be reasonably certain to occur.

monitoring and conservation measures as well as the use of fencing and active herd management. The grazing strategy is incorporated into grazing authorizations and the strategy's measures are binding on the permittees, requiring them to move cattle when move or endpoint indicators are reached. *See e.g.,* RP 29318. ONDA takes issue with the enforcement standards contained in the BiOp arguing that enforcement is wholly discretionary and not reasonably certain to occur. The BiOp provides, in part that:

> [T]he MNF has full authority to ensure compliance with allotment conservation measures. Consistent with this authority, the MNF will hold permittees accountable for compliance with the requirements of their grazing permits and annual instructions. Should move triggers be exceeded, the MNF has full range of remedial and disciplinary actions that may be taken depending upon the severity of the non-compliance. At minimum, however, the MNF will document any non-compliance, discuss it with the permittee, and develop and implement strategy for the particular unit to ensure move trigger compliance in the future. Corrective actions include, but are not limited to, changes in unit rotation, increased riding, altered salt or low moisture nutrition block placement, temporary reductions in stocking levels, changes in move triggers, or permanent administrative changes to the permit. Regardless of the action, recurrent failures to meet move triggers or end-point indicators will result in changes to ensure standards are met and potential impacts to MCR steelhead and MCR steelhead designated critical habitat are adequately addressed.

*Id.*

> Failure to meet move trigger/move indicators in a single year will result in a documented discussion with the permittee(s) and a strategy will be developed that [is] intended to ensure that these standards are met during the following year. When end-point indicators are missed repeatedly, documented changes in management will be required . . . . These actions will be well documented and their effectiveness will be closely monitored. Repeated failures to meet standards will result in an aggressive and well documented effort to ensure these standards are met. If necessary, the Ranger may determine that administrative action (to the permit) is warranted.

NMFS AR 819-20.

ONDA contends that the grazing management program violates the ESA because it "provides no operating criteria or action schedule, specifying when mitigation actions must be taken. It is not possible to predict what, how and when [the program's management] measures

29- OPINION AND ORDER

will be implemented." *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 341 (9th Cir. 2007).

The court must strike a difficult balance in reviewing the enforcement strategy outlined in the administrative record.  The court cannot substitute its judgment for that of the expert agency tasked with adaptively managing the grazing allotments, however, the court must also ensure that there are substantive measures in place to deal with noncompliance.  Here, the court finds that the grazing strategy passes muster as it sets up an enforcement process that is triggered by certain criteria (i.e. by the exceedance of the bank alteration standard).  While the enforcement strategy could certainly be bolstered by specific consequences for repeated noncompliance, the conservation measures –as designed–  are "reasonably specific, certain to occur, and capable of implementation." *Ctr. for Biol. Diversity v. Rumsfeld*, 198 F. Supp. 2d at 1152.

While the grazing program and enforcement process are reasonable, the fact that their implementation relies upon Forest Service and permittee action is more problematic.  ONDA contends that the NMFS was not entitled to rely upon third party actions that were not reasonably certain to occur.  ONDA contends that permittees were unlikely to implement the conservation measures and that the MNF was incapable of administering the conservation program.

The NMFS cannot rely on a third party to implement conservation measures that are not reasonably certain to occur.  *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196, 1213 (D. Or. 2003).  Because permittees have failed to follow conservation measures in the past, ONDA argues that it was unreasonable to rely on their promises that they would comply in the future. Past failures, in and of themselves, do not render the management strategy unreasonable.  The

30- OPINION AND ORDER

BiOp and ITS contain binding obligations on permittees requiring compliance with the conservation measures and those obligations are not hollow simply because of past failures. If that were the case, no grazing strategy for the MNF that relies on permittee compliance could ever be found reasonable.

The question of whether the MNF could implement the proposed conservation measures is more difficult. The MNF indicated to the NMFS that it could and would carry out the conservation measures relied upon in the BiOp. However, there was reason to believe that the Forest Service would be incapable of accomplishing all conservation and monitoring measures set out in the ambitious BiOp. *See State Farm*, 463 U.S. at 43 (an agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem").

When reviewing the BiOp, range staff opined (in internal Forest Service documents) that the monitoring measures were "[u]nrealistic with current funding, personnel, and priorities," and that the staff would "not be able to accomplish this by 2008 -not in every unit." RP 29566-68. A member of the range staff wondered "[w]here is the MNF grazing monitoring program . . . describe[d] in detail in . . .the [BiOp], it states every allotment will have either a [designated monitoring area] or a representative reach that will be monitored multiple times a season. Not practical– I have been here for 1 year and no one has shared this monitoring program with me yet." *Id*. at 29567. Although the MNF promised an exhaustive monitoring and conservation strategy, members of the staff charged with implementing it were either entirely unaware of its existence, or doubted their ability to complete it.

Federal defendants counter that the NMFS reasonably relied upon the consultation documents provided by the Forest Service, including biological assessments, which fully explained the MNF's monitoring program. Federal defendants argue that post-decisional isolated

31- OPINION AND ORDER

comments by range staff questioning the monitoring program are irrelevant. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658-59 (2007) (holding that an agency's final action which is inconsistent with internal preliminary determinations is not arbitrary and capricious); *Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, No. 97-cv-775, 1998 WL 1988556, at *10 (W.D. Wash. May 29, 1998) (holding that the NMFS is not required to question whether the Forest Service will implement a LRMP as advertised for purposes of § 7 and that the "NMFS must analyze the action *as proposed* by the proponent agencies").

The court concludes that the NMFS was entitled to rely upon the official representations of the Forest Service that it would be able to conduct the conservation and monitoring measures proposed in the action, and that the NMFS was not required to second guess those representations. *Pac. Coast Fed'n of Fisherman's Ass'ns*, 1998 WL 1988556, at *10. Accordingly, the court is compelled to conclude that the NMFS did not violate the ESA in issuing the BiOp based upon those representations. Had the comments described above been made to the NMFS before the BiOp was issued, the court could not uphold the NMFS's action.

Although the NMFS was not required to analyze the veracity of the representations made by the Forest Service, the Forest Service was not entitled to rely upon the resultingly flawed BiOp. The Forest Service may not make empty promises, secure a no jeopardy BiOp, and then go forward with the proposed action –absent the monitoring and enforcement promised– simply because a no jeopardy BiOp has issued. *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) (the "Forest Service's reliance on the [NMFS's] opinion was not justified in light of its failure to provide the" NMFS with all relevant information). The buck must stop somewhere. Here, the Forest Service acted arbitrarily and capriciously and failed to fulfill its duties under §

32- OPINION AND ORDER

7(a)(2) by issuing grazing authorizations in 2007 and 2008 on a BiOp it knew was based on inaccurate information. When authorizing grazing in 2007 and 2008, the Forest Service failed to independently insure that the grazing authorized would not result in jeopardy to MCR steelhead or in the adverse modification of their habitat. Only in 2009, under this court's injunction, was the MNF able to conduct all monitoring and enforcement actions contemplated by the BiOp. Because the grazing strategy relied upon by the NMFS in issuing the BiOp was actually implemented in 2009, the MNF did not violate § 7(a)(2) by issuing grazing authorizations for that year.

### 2. Habitat Baseline and Habitat Recovery

The NMFS concluded that the authorized grazing would not result in unlawful adverse habitat modification. ONDA argues that this was irrational in light of the degraded environmental baseline and the habitat effects of grazing. ONDA first argues that the NMFS failed to consider the cumulative effects of the proposed action in light of the degraded environmental baseline and, second, that the NMFS failed to evaluate whether RMOs were being achieved and whether the proposed grazing would comply with PACFISH.

Pursuant to 50 C.F.R. § 402.14(g)(3), the NMFS must evaluate the effects of a proposed action and "cumulative effects on the listed species or critical habitat." The "effects of the action" includes both direct and indirect effects in concert with interrelated and interdependent activities "that will be added to the environmental baseline." 50 C.F.R. § 402.02. In the Upper John Day, Middle Fork John Day, and North Fork John Day River subbasins, all indicators of healthy steelhead habitat, such as water temperature and pool frequency, are at least partially "functioning at risk" or "functioning at unacceptable risk." NMFS AR 850-53. This court concludes that the NMFS adequately considered the degraded environmental baseline at the river

33- OPINION AND ORDER

subbasin scale, and reasonably concluded that the proposed grazing would not result in adverse

habitat modification to the allotments at issue. *See e.g.* RP 29426 (explaining that "the proposed

grazing activities will allow previously-degraded riparian habitat to recover, resulting in

improved steelhead habitat" and that although improvements are expected in habitat conditions

on the allotments, the improvements will not result in improved habitat indicators at the larger

river subbasin level).

ONDA next argues that the NMFS was required to evaluate whether RMOs are being

achieved and whether the proposed grazing would comply with PACFISH. ONDA contends that

the NMFS was obligated to ensure that the proposed grazing would comply with PACFISH, yet

the BiOp does not evaluate whether the proposed grazing would result in a near natural rate of

recovery, and does not mention any RMO monitoring data. While RMO monitoring data would

prove useful in evaluating the proposed grazing's compliance with PACFISH, the NMFS has no

duty under the ESA to evaluate PACFISH compliance. The NMFS must determine whether a

proposed action is likely to adversely affect a listed species or its critical habitat, but is not

required to determine forest plan consistency. *Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l

Marine Fisheries Serv.*, 265 F.3d 1028, 1034-35 (9th Cir. 2001). The NMFS's independent

jeopardy and adverse modification analyses satisfied the ESA. The NMFS was not further

required to determine whether the proposed actions were compliant with the LRMP (which in

turn must be compliant with PACFISH).

         3.     ESA § 9

The Forest Service authorizing grazing in 2007 and 2008 that resulted in exceedances of

the ITS. ONDA argues that the grazing resulted in the take of MCR steelhead and violated § 9

of the ESA. 16 U.S.C. § 1538(a)(1)(B).

34- OPINION AND ORDER

The take of a listed species "that complies with the conditions set forth in the ITS" is permitted. *Ramsey v. Kantor*, 96 F.3d 434, 441 (9th Cir. 1996); 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5). By issuing an ITS to the Forest Service for the grazing authorized under the BiOp, the NMFS provided the Forest Service with protection from § 9 take liability, so long as the take complies with the conditions of the ITS. Take that exceeds the conditions of the ITS invalidates the safe harbor provision of the ITS, leaving the agency that authorized the activity resulting in take liable for violating § 9.[8] *Or. Natural Res. Council*, 476 F.3d at 1040. However, where the ITS utilizes a habitat proxy for take, as here, the exceedance of the ITS in and of itself does not establish a violation of § 9. Rather, the exceedance of the ITS abrogates the safe harbor provision of the ITS, but plaintiffs must still demonstrate that take has occurred.

Unlike most claims at issue in this litigation, a claim pursuant to § 9 is not governed by the arbitrary and capricious standard of the APA. Rather, to obtain relief on this claim, ONDA must prove by a preponderance of the evidence that the grazing authorized by the Forest Service in 2007 and 2008 resulted in the take of one or more MCR steelhead. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). "Take" includes actions that actually kill or injure steelhead, including "significant habitat modification or degradation where it actually kills or injures [a steelhead] by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Sweet Home Chapter of Cmtys. for a Great Or.*, 515

---

[8] Although the question has not been directly addressed by the Ninth Circuit, this court finds that Forest Service may be held liable for authorizing grazing that results in unlawful take. *See e.g.*, *Pac. Rivers Council v. Brown*, No. 02-243-BR, 2002 WL 32356431, *11-12 (D. Or. Dec. 23, 2002) (state agency's approval of actions resulting in take is a sufficient ground for holding the agency liable for the take). The case for holding the Forest Service liable for excessive take is particularly strong in light of evidence demonstrating that the MNF was unable or unwilling to conduct all monitoring and enforcement contemplated by the BiOp and ITS, but nevertheless issued grazing authorizations.

U.S. at 696-700.

The bank alteration standards contained in the ITS were violated in both the 2007 and 2008 grazing seasons on numerous allotments, resulting in significant habitat modification. In 2008, the MNF documented exceedances of bank alteration standards in multiple locations on six of the thirteen allotments subject to this litigation. Supplemental AR 380, 383, 385-86, 391-922, 405, 408. On the Fox Creek Allotment, bank alteration was measured at forty-nine percent and on the Flat Camp Allotment, it was measured at fifty-one percent. *Id.* at 480, 486. The results of the 2007 season were, perhaps, worse. *See* RP 31170-82 (2007 End-of-Year Report documenting exceedances of the ITS on multiple allotments including the Murderers Creek, Hamilton/King, and Lower Middle Fork Allotments); *see also* Supplemental AR 266-68 (MNF's aquatic biologist noting that it is assumed "take" has occurred when the thresholds in the ITS are exceeded and opining that in 2007, "'take' may have occurred on" the Murderers Creek Allotment and on the Hamilton/King Allotment where bank alteration levels were measured at sixty percent and other standards were exceeded as well). It is likely that violations of the ITS were underreported in 2007 and 2008 due to inadequate monitoring by the Forest Service.

The inordinate exceedances of the bank alteration standards documented in 2007 on the Murderers Creek and Hamilton/King Allotments and in 2008 on the Fox Creek Allotment are particularly deplorable in light of the Forest Service's appraisal of those allotments as containing moderate to high potential spawning habitat and as having a high risk potential for direct take of steelhead. RP 31202-03. This court has carefully reviewed the administrative record and the extra-record materials submitted by the parties, and concludes that it is possible that take occurred on numerous allotments in both 2007 and 2008, and that it is likely take occurred in 2007 on the Murderers Creek and Hamilton/King Allotments, and on the Fox Creek Allotment in

2008, due to significant habitat degradation.

>    4.    Reinitiation of Consultation

ONDA contends that the Forest Service failed to reinitiate consultation as required by 50 C.F.R. § 402.16.  An agency must reinitiate formal consultation "[i]f the amount or extent of taking specified in the [ITS] is exceeded."  *Id.* at § 402.16(a).  As discussed above, the ITS was violated on multiple allotments in 2007, 2008, and 2009.  Following each violation of the ITS, the Forest Service engaged in informal consultation with the NMFS.  However, it was not until after the 2009 grazing season that the Forest Service reinitiated formal consultation, and even then, the consultation will not be completed until after the 2010 grazing season.  Formal consultation involves the preparation of a biological assessment and culminates with the issuance of a BiOp, and an ITS, if necessary.  50 C.F.R. §§ 402.14(c)(6), (g)(4); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1570 (9th Cir. 1993).  By failing to reinitate consultation following the exeedances of the ITS during the 2007 and 2008 seasons, the Forest Service violated the ESA.

ONDA also alleges that the Forest Service violated § 7(d) of the ESA when it authorized grazing in 2009 absent § 7(d) letters on five allotments.  Once formal consultation is required, an agency may not continue with an action that makes an "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" § 7(a)(2). 16 U.S.C. § 1536(d); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("[r]einitiation of consultation requires [] the . . . NMFS to issue a new [BiOp] before the agency action may continue");  *Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034-35 (9th Cir. 2005) (noting that § 7(d) was "enacted to ensure that the *status quo* would be maintained during the consultation process").  The *status quo* in the context of grazing

37- OPINION AND ORDER

on critical habitat is no grazing, and the issuance of grazing authorizations impermissibly deviates from the *status quo* absent a § 7(d) letter.  *Pac. Rivers Council v. Thomas*, 936 F. Supp. 738, 945 (D. Idaho 1006).

Federal defendants contend that they need not comply with § 7(d) for those allotments on which there has not been an exceedance of the ITS.  However, in the context of the ESA, the term "agency action" is defined broadly and the "ESA requires the [BiOp] to analyze the effect of the *entire* agency action."  *Conner v. Burford*, 848 F.2d 1411, 1453 (9th Cir. 1988).  Here, the entire agency action includes grazing on all thirteen allotments, and reinitiation of formal consultation necessarily includes all thirteen allotments.  It makes little sense to conclude that the term "agency action" should be read more narrowly in the context of § 7(d) than in the rest of the ESA.  Accordingly, the strictures of § 7(d) apply to all thirteen allotments.  The Forest Service violated the ESA by failing to comply with § 7(d).

5.     NFMA Claims

ONDA contends that the Forest Service violated the NFMA by authorizing grazing on seven allotments in 2007, 2008, and 2009 without evaluating RMOs and without obtaining data regarding management indicator species as required by the LRMP.  ONDA argues that the Forest Service needs to measure RMOs in order to evaluate whether grazing practices are allowing habitat recovery at a near natural rate in order to comply with PACFISH grazing standard GM-1.  Similarly, ONDA asserts that the Forest Service needs to evaluate steelhead habitat and steelhead populations to ensure that the MNF is providing "the necessary habitat to maintain or increase populations" of MCR steelhead and meet the LRMP's "variablity threshold" of no more than a ten percent decrease in habitat capability.  Ex. 4 to Pls.' Mem. at 7, 14 (IV-63, V-13 of the MNF's 1990 LRMP).

38- OPINION AND ORDER

Federal defendants respond that the Forest Service satisfied grazing standard GM-1 and the LRMP's requirements for management indicator species, albeit without monitoring RMOs or producing "Monitoring and Evaluation Reports" for steelhead viability.  Federal defendants assert that the Forest Service has carefully assessed the impacts of grazing on steelhead habitat and has issued guidance on how to achieve compliance with GM-1, emphasizing the authorization of grazing that does not result in impacts that carry over to the next year.  Federal defendants contend that this court should defer to their scientific expertise in complying with the LRMP.  *See The Lands Council*, 537 F.3d at 993-94 (courts should "decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show . . . that it has met the NMFA's requirements").

The court agrees with federal defendants in-so-far as there is no legal basis to conclude that the Forest Service must actually monitor RMOs or conduct Monitoring and Evaluation Reports to evaluate steelhead habitat.  Because PACFISH was initially implemented as an interim program, it expressly noted that changes in riparian conditions could be monitored in lieu of RMOs.  RP 2483 ("[s]ince the condition of the riparian vegetative community directly affects these RMOs and changes in riparian vegetation are generally detectable within short time periods, the recovery of the vegetation component of the riparian system will be used" as a proxy for RMOs).  Unfortunately, the monitoring requirements of PACFISH have not been updated in keeping with the much longer timeframe over which it is now being implemented and this court cannot now impose such requirements.  Similarly, the LRMP sets a variability threshold for steelhead habitat but fails to set forth any specific method of measuring compliance with the standard.  This court is not empowered to specify how the Forest Service should comply with PACFISH's and the LRMP's requirements.  *The Lands Council*, 537 F.3d at 993-94.

39- OPINION AND ORDER

The Forest Service maintains discretion regarding how it complies with the LRMP and PACFISH, as well as determining the type of data used to evaluate their compliance. Whether the Forest Service makes that decision based on sufficient data, however, is not. The Forest Service issued guidance on how to comply with GM-1 and was purportedly evaluating steelhead habitat. However, there is little in the record to suggest that the Forest Service has gathered enough data to effectively determine whether it is  in compliance with PACFISH or the LRMP, and there is even less evidence to suggest that it has actually evaluated that data in an effort to ascertain their compliance. This court "cannot defer to a void." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1142 (9th Cir. 2008); *Burlington Truck Lines v. United States*, 371 U.S. 156, 158 (1962) (the agency must consider "relevant factors" and articulate "a rational connection between the facts found and the choices made"). It is possible that the monitoring set forth in the BiOp would be sufficient to make these determinations, but in light of the Forest Service's failure to conduct adequate monitoring in 2007 and 2008, the Forest Service cannot rely on that data. This court declines to direct the Forest Service on how to evaluate whether steelhead habitat is recovering at a near natural rate, or whether there has been more than a ten percent decline in habitat capability. However, the court concludes that the Forest Service has failed to adequately evaluate these standards. Accordingly, the Forest Service has acted arbitrarily and capriciously in violation of the NMFA's consistency requirement by authorizing grazing in 2007, 2008, and 2009 on the seven allotments specified in the Complaint.

## CONCLUSION

For the foregoing reasons, ONDA's Motion to Supplement the Administrative Record [404] is GRANTED and ONDA's Motion for Summary Judgment [401] is GRANTED IN PART, permittees' Motion to File Extra Record Evidence [398] is GRANTED and permittees'

40- OPINION AND ORDER

Motion for Summary Judgment [379] is GRANTED IN PART, and federal defendants' Motion

for Summary Judgment is GRANTED IN PART [429].  The parties are ordered to confer

regarding appropriate remedies for the violations of the ESA and NFMA discussed above and to

propose a briefing schedule if necessary.  A joint status report is due July 1, 2010.

IT IS SO ORDERED.

DATED this __4___ day of June, 2010.


       /s/ ANCER L. HAGGERTY_____
         ANCER L. HAGGERTY
        United States District Judge

41- OPINION AND ORDER